IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | |
|---|---|
| DANIEL ENRIQUE CANTÚ, | |
| *Plaintiff,* | |
| v. | |
| S/A JAMES M. MOODY; S/A ERIN S. LABUZ a/k/a ERIN S. HAYNE; S/A NATHAN HUSAK; S/A CHRISTOPHER LEE; S/A DAVID DE LOS SANTOS; S/A RYAN PORTER; S/A ROSA LEE GARZA; Unknown FBI Officers; Unknown US Customs and Border Protection Officers; Unknown US Marshals Officers; Deputy RICK CHAPA; Deputy ROGER RICH; Unknown Hidalgo County Officers; DPS Officer ALFREDO BARRERA; DPS Officer DANIEL MARTINEZ; DPS Officer DONICIO ARIGULLIN; Unknown DPS Troopers; each of the foregoing in their individual capacity; Sheriff J.E. GUERRA, in his official capacity; UNITED STATES OF AMERICA; HIDALGO COUNTY, TEXAS; LCS CORRECTIONS SERVICES, Inc.; and DOES 1-50, inclusive, each in their official and individual capacities. | **C.A. No.: 7:15-cv-0354**<br><br>**JURY DEMANDED**<br><br>**COMPLAINT for DAMAGES** |
| *Defendants.* | |

<u>**PLAINTIFF'S SECOND AMENDED COMPLAINT**</u>

**TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:**

PLAINTIFF DANIEL ENRIQUE CANTÚ, through his undersigned counsel, brings this action for damages pursuant to the United States Constitution, its Fourth, Fifth, and Fourteenth Amendments; *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971); 28 U.S.C. § 1346; 42 U.S.C. §§ 1983, 1985, 1988; and common law.

//

---

## I. INTRODUCTION

1.      Mr. Cantú hereby complains that Defendants named herein, while acting under color of federal and state law, conspired and deprived him of his clearly established constitutional rights to remain free from unreasonable search and seizure, bragged about their doing so to the media, and fabricated evidence and/or manufactured probable cause in an attempt to make his criminal conviction certain. Cantú was kept in custody for more than two years as a pretrial detainee, around fourteen months of that time in punitive solitary confinement, until he was acquitted by a jury. During this time, Cantú was diagnosed with medical maladies but denied medical care.

2.      Defendants targeted Cantú because he has a felony conviction and was formerly imprisoned, and because he is a member of the Texas Mexican Mafia.

3.      Defendants' purposes for violating Cantú's rights were to improve each of their professional arrest and conviction rate records against drug traffickers, to use the improved rates to justify further federal and state funding to their respective employers for prosecuting drug traffickers, and therefrom to reap benefits of and to otherwise be personally enriched by their improved arrest and conviction rates.

4.      Cantú's property, seized at the time of his false arrest, has not been returned.

5.      In support thereof, Cantú alleges the following from his personal knowledge, and under his information and belief.

## II. JURISDICTION and VENUE

6.      This action is brought pursuant to the U.S. Constitution, Article III § 2 (U.S. as a party); 28 U.S.C. §§ 1331, 1343(a), 1346(b) (federal question, civil rights, federal tort claim act); 42 U.S.C. §§ 1983, 1985 (civil rights, conspiracy).

7.      This Court has supplemental jurisdiction pursuant to 28 USC § 1367 to adjudicate pendent claims arising under the laws of the State of Texas.

8.      Venue lies in the U.S. District Court for the Southern District of Texas, the district in which the claim arose, pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b).

9.      Cantú submitted an administrative claim to the FBI. His claim was denied. He has therefore exhausted all administrative remedies against the FBI required by the Federal Tort Claims Act.

10.     Cantú submitted an administrative claim to the U.S. Marshals Service. His claim is pending. His tort claims against the U.S. Marshals Service are excluded from this complaint unless and until they have accrued. His constitutional injuries against the U.S. Marshals Service that have accrued and are not subject to the Federal Tort Claims Act are pled herein.

11.     All conditions precedent have been performed or have occurred.


### III. PROCEDURAL HISTORY

12.     As a *pro per* plaintiff, Cantú filed a lawsuit in this court on Oct. 31, 2014 for the injuries he sustained as described herein. *See* case number 7:14-mc-1849.

13.     On Jan. 30, 2015, the court designated the lawsuit as civil action 7:15-cv-0043.

14.     On July 16, 2015, Cantú voluntarily dismissed civil action 7:15-cv-0043 against all defendants without prejudice.


### IV. JURY DEMAND

15.     Plaintiff respectfully demands a trial by jury.


### V. PARTIES

16.     Plaintiff DANIEL ENRIQUE CANTÚ ("CANTÚ") is a competent adult. He was a resident of Hidalgo County at all times relevant to this Complaint and at the time this lawsuit was filed.

17.     Defendants Special Agent JAMES M. MOODY ("MOODY"), ERIN S. LABUZ a/k/a ERIN S. HAYNE ("LABUZ"), NATHAN HUSAK ("HUSAK"), CHRISTOPHER LEE ("LEE"), DAVID DE LOS SANTOS ("DE LOS SANTOS"), RYAN PORTER ("PORTER"), ROSA LEE GARZA

("GARZA"), and Unknown FBI Special Agents, individually and collectively "FBI DEFENDANTS," are and were at all times relevant hereto:

    a. Individuals residing in the United States;

    b. Employed by the FBI, an executive agency of the United States of America;

    c. May be served with process at: Federal Bureau of Investigation, FBI Building, 1200 N. McColl Road, McAllen, TX 78501.

18.    Defendants Unknown U.S. Customs and Border Protection Officers ("UNKNOWN CBP") were at all times relevant hereto:

    a. Individuals residing in the United States;

    b. Employed by the U.S. Customs and Border Protection, an executive agency of the United States of America;

    c. May be served with process at: U.S. Customs and Border Protection, 3000 West Military Highway, McAllen, TX 78503.

19.    FBI DEFENDANTS and UNKNOWN CBP are individually and collectively hereafter referred to as "FEDERAL DEFENDANTS."

20.    Defendants Unknown U.S. Marshals Service Officers ("UNKNOWN MARSHALS") were at all times relevant hereto:

    a. Individuals residing in the United States;

    b. Employed by the U.S. Marshals Service, an executive agency of the United States of America;

    c. May be served with process at: U.S. Marshals Service, 515 Rusk Ave., Room 10130, Houston, TX 77002.

21.    Defendants Texas Department of Public Safety ("DPS") Officer ALFREDO BARRERA ("BARRERA"), DPS Officer DANIEL MARTINEZ ("MARTINEZ"), DPS Officer DONICIO ARIGULLIN ("ARIGULLIN"), and Unknown DPS Officers are individually and collectively

hereafter referred to as "DPS DEFENDANTS," were at all times relevant hereto:

   a.   Individuals residing in the United States;

   b.   Employed by DPS, a law enforcement agency of the State of Texas;

   c.   May be served with process at: Texas Department of Public Safety, 2525 N.

   International Blvd., Weslaco, TX 78596.

22.   Defendants Hidalgo County Sheriff's Deputies RICK CHAPA ("CHAPA"), ROGER RICH

("RICH"), and Unknown Hidalgo County Sheriff's Deputies, are individually and collectively

hereafter referred to as "DEPUTY DEFENDANTS," were at all times relevant hereto:

   a.   Individuals residing in the United States;

   b.   Employed by the Hidalgo County Sheriff's Office;

   c.   May be served with process at: Hidalgo County Sheriff's Office, 711 El Cibolo Road,

   Edinburg, TX 78541.

23.   All Defendants listed above are sued in their individual capacity.

24.   Defendant Hidalgo County Sheriff J.E. GUERRA ("GUERRA") was at all times relevant

hereto:

   a.   An individual residing in the United States;

   b.   Presently employed by the Hidalgo County Sheriff's Office;

   c.   Is the final policymaker for rules and policies within the Sheriff's Office;

   d.   May be served with process at: Hidalgo County Sheriff's Office, 711 El Cibolo Road,

   Edinburg, TX 78541.

   e.   GUERRA is sued in his official capacity.

25.   Defendant UNITED STATES OF AMERICA ("USA") is the appropriate defendant under

the Federal Tort Claims Act.

26.   Defendant Hidalgo County, Texas ("COUNTY") is a political subdivision of the State of

Texas, and is the final policymaker for laws, rules, and policies within its jurisdiction. It may be

served with process by serving its county judge, the Honorable Ramon Garcia, at 100 E. Cano St. 2nd Floor, Edinburg, TX 78539.

27.    Defendant LCS CORRECTIONS SERVICES, Inc. ("LCS")

   a.  Is a corporation registered in Florida with its principal place of business at 2475 Enterprise Road, Suite 100, Clearwater, FL 33763.

   b.  Presently does business in Texas.

   c.  Can be served at its agent for service of process at: Mark R. Paisley, 601 East Main St., 4th Floor, Alice, TX 78332.

28.    Defendant DOES 1-50, inclusively, are individuals or institutions who participated in, facilitated, or had a duty to prevent or stop the injuries described herein, whose true identities are presently unknown but will be added to this complaint when their identities are discovered. DOES 1-50 are each sued in their individual and official capacities.

29.    FEDERAL DEFENDANTS, DPS DEFENDANTS, DEPUTY DEFENDANTS, and DOES 1-50 are individually and collectively hereafter referred to as "ARREST DEFENDANTS."

30.    UNKNOWN MARSHALS, LCS, and DOES 1-50 are individually and collectively hereafter referred to as "PRISON DEFENDANTS."

31.    GUERRA and COUNTY are individually and collectively hereafter referred to as "POLICY DEFENDANTS."

32.    All Defendants listed in this section are individually and collectively hereafter referred to as "DEFENDANT" and/or "DEFENDANTS."

33.    Plaintiff alleges that each of the supervisors, managers, employees, and agents of DEFENDANTS, in their actions described herein, acted within the course and scope of their employment or agency with the DEFENDANTS as supervisory, investigative, custodial, or law enforcement officers.

34.    Plaintiff alleges that each DEFENDANT was an agent of the other DEFENDANTS and

ratified the conduct of or conspired with the other DEFENDANTS. In this regard, Plaintiff is

informed and believes and on that basis alleges that, at all relevant times, each of DEFENDANTS,

whether named or fictitious, was the agent or employee or each of the other DEFENDANTS, and in

doing the things alleged to have been done in this complaint, acted within the scope of such agency

or employment, ratified the acts of the others, or conspired with the others.

35.     Plaintiff alleges that each DEFENDANT is responsible in some manner for the injuries

described herein, and that Plaintiff's injuries were proximately caused by the conduct of such

DEFENDANT.


## VI. FACTS

### Investigation of the Texas Mexican Mafia

36.     On or about Feb. 17, 2010, LEE

   a.  Was a supervisor with FBI.

   b.  Initiated an investigation with FBI DEFENDANTS into the Texas Mexican Mafia of Rio

       Grande Valley ("TMM").

   c.  Determined Jesus Barrientes ("BARRIENTES") was the 'captain' or leader of TMM.

37.     BARRERA

   a.  Was a supervisor with DPS.

   b.  Investigated TMM jointly with FBI DEFENDANTS.

   c.  Assigned Unknown DPS DEFENDANTS to the investigation.

   d.  Supervised said Unknown DPS DEFENDANTS.

38.     Juan Pablo Rodriguez ("RODRIGUEZ")

   a.  Was a member of TMM.

   b.  Was a convicted felon.

   c.  Was in danger of deportation because of his conviction.

    d.  Was offered by FBI DEFENDANTS (1) circa eight thousand five hundred dollars ($8,500), and (2) help with his immigration status so that he could lawfully remain in the U.S., if (3) he would defect from TMM and instead work with the FBI as an 'informant' or 'confidential human source.'

    e.  Accepted the offer.

    f.  Received the cash payment.

    g.  Received electronic devices from FBI including a mobile phone.

    h.  Used the electronic devices to allow FBI to monitor and record conversations he had with other persons, including TMM members.

39.    LABUZ

    a.  Was responsible for the proper operation of the electronic recording devices used by RODRIGUEZ.

    b.  Monitored directly or indirectly all phone calls from or to RODRIGUEZ when RODRIGUEZ used said electronic recording devices.

    c.  Reported any recorded information she thought relevant to FBI DEFENDANTS.

40.    FBI DEFENDANTS had access to recorded information independently of LABUZ.

41.    HUSAK

    a.  Was a supervisor with FBI.

    b.  Worked with or took command from LEE on the investigation.

    c.  Determined that BARRIENTES planned to smuggle heroin from Mexico to the U.S. over the Rio Grande River using two Mexican smugglers ("SMUGGLERS").

    d.  Organized a sting operation with RODRIGUEZ and ARREST DEFENDANTS to arrest TMM members for smuggling heroin.

    e.  Instructed RODRIGUEZ to persuade BARRIENTES to use him to escort the SMUGGLERS and heroin from pick-up to delivery to an unknown individual.

f. Instructed RODRIGUEZ and CHAPA to pick up SMUGGLERS and heroin and deliver them to an H.E.B. supermarket parking lot predetermined as the arrest site for the sting operation.

## The False Arrest of CANTÚ

42. HUSAK and BARRERA

   a. On or about Aug. 10, 2011, at or about 5:00 a.m., met with ARREST DEFENDANTS to brief said DEFENDANTS on the sting operation.

   b. Identified RODRIGUEZ as an informant and CHAPA as an undercover police officer to the ARREST DEFENDANTS.

   c. Identified an unknown individual as the person to receive the heroin from RODRIGUEZ and CHAPA.

   d. Did not identify CANTÚ as the person whom they expected to receive the heroin from RODRIGUEZ and CHAPA.

43. CHAPA

   a. At or about 7:00 a.m. drove RODRIGUEZ in a Mercury Grand Marquis to the Rio Grande River.

   b. Picked up SMUGGLERS who had a thermos that concealed circa 1.9 kg of heroin.

   c. Placed or allowed to be placed the thermos and heroin in the car's trunk.

   d. Drove RODRIGUEZ and SMUGGLERS to the predetermined H.E.B. parking lot.

44. RODRIGUEZ

   a. While en route to H.E.B., called the unknown individual BARRIENTES, HUSAK, and BARRERA designated for delivery to confirm the delivery of heroin at H.E.B.

   b. Was unable to reach the unknown individual.

   c. At or about 7:30 a.m., called CANTÚ because RODRIGUEZ could not reach the unknown individual.

    d. Told CANTÚ that RODRIGUEZ needed to speak to him in-person right away.

    e. Arranged with CANTÚ to meet with him at the H.E.B. parking lot within fifteen minutes of said phone call.

45.   CANTÚ

    a. Is and was a member of TMM.

    b. Had lawful possession and was the *de facto* owner of a 2003 BMW 325i automobile.

    c. Drove his BMW to the H.E.B. parking lot.

    d. Expected to meet and talk with RODRIGUEZ.

    e. Parked adjacent to RODRIGUEZ's car, with CANTÚ's passenger-side facing RODRIGUEZ's driver-side.

    f. Lowered his passenger-side window for RODRIGUEZ to be able to talk to him.

46.   RODRIGUEZ

    a. Exited the Mercury Grand Marquis automobile from the passenger-side.

    b. Walked to the trunk of the Mercury Grand Marquis.

47.   CHAPA, while in the driver's seat, unlocked the trunk for RODRIGUEZ.

48.   RODRIGUEZ

    a. Opened the trunk.

    b. Grabbed the thermos with a rag or shirt.

    c. Walked to CANTÚ's passenger-side door.

    d. Said, "I need you to do me a favor."

    e. Put the thermos onto CANTÚ's passenger-side seat through the open window.

    f. Ran a short distance and dropped to the ground.

49.   CANTÚ

    a. Did not know why RODRIGUEZ put the thermos in CANTÚ's car.

    b. Said to RODRIGUEZ, "What are you doing?"

    c.  Never touched the thermos.

50.  Approximately forty-five (45) known and unknown DEFENDANTS

    a.  Were lying in wait for RODRIGUEZ to put the thermos into CANTÚ's car.

    b.  Rushed to CANTÚ's car.

51.  DE LOS SANTOS

    a.  Opened CANTÚ's driver-side door.

    b.  Violently pulled CANTÚ from his car.

    c.  Pinned CANTÚ on the ground.

    d.  Arrested and handcuffed CANTÚ.

    e.  Searched CANTÚ.

    f.  Found one thousand, nine hundred thirty-six dollars and thirty-six cents ($1,936.36) on CANTÚ's person.

    g.  Did not find any weapons.

    h.  Drove CANTÚ, HUSAK, and PORTER to the FBI Building in McAllen, Texas.

    i.  Did not answer CANTÚ's question about why he was arrested.

    j.  Told CANTÚ that everything would be explained to him at the FBI Building.

52.  GARZA, MARTINEZ, and RICH each

    a.  Were photographers for the sting operation.

    b.  Took photographs of the sting operation.

53.  An Unknown DEFENDANT took video of the sting operation.

54.  MOODY

    a.  Knew that CANTÚ was a member of TMM, had a felony conviction, and had previously been incarcerated.

    b.  Knew that a paid informant who placed illegal narcotics into an innocent bystander's car did not make the bystander guilty of any crime.

    c.  Had no probable cause to arrest CANTÚ on Aug. 10, 2011.

    d.  Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ in order to have him convicted of possession of illegal narcotics with intent to sell.

    e.  Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ in order to be able to claim immunity from CANTÚ's accrued cause of action for False Arrest.

    f.  Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ because he had a felony conviction and had previously been incarcerated.

    g.  Swore in an affidavit against CANTÚ, "…a navy blue BMW, driven by Daniel Enrique CANTÚ, pulled up next to the Mercury Grand Marquis. CANTÚ exited the vehicle and recovered a red and white cooler from the trunk of the Mercury Grand Marquis. CANTÚ subsequently placed the water cooler into the passenger compartment of the BMW through the front passenger side door."

    h.  Swore that CANTÚ acted overtly, taking the cooler from RODRIGUEZ's car and placing the cooler into his own car, in furtherance of the DEFENDANTS' agreement to help ensure that CANTÚ would be convicted and to violate CANTÚ's civil rights.

    i.  Used his perjured sworn affidavit to obtain a criminal complaint against CANTÚ and to establish *post facto* probable cause to justify arresting CANTÚ.

    j.  Knew and intended that the perjured sworn affidavit, the serious charges alleged against CANTÚ, CANTÚ's affiliation with TMM, and CANTÚ's criminal record would result in CANTÚ being denied bail and held in federal custody until trial.

    k.  Knew that if CANTÚ was convicted, CANTÚ could be sentenced to life in prison.

55.   LABUZ

   a.   Knew that CANTÚ was a member of TMM, had a felony conviction, and had previously been incarcerated.

   b.   Knew that a paid informant who placed illegal narcotics into an innocent bystander's car did not make the bystander guilty of any crime.

   c.   Had no probable cause to arrest CANTÚ on Aug. 10, 2011.

   d.   Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ in order to have him convicted of possession of illegal narcotics with intent to sell.

   e.   Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ in order to be able to claim immunity from CANTÚ's accrued cause of action for False Arrest.

   f.   Discussed and willfully and knowingly agreed with other DEFENDANTS to fabricate evidence and/or manufacture probable cause against CANTÚ because he had a felony conviction and had previously been incarcerated.

   g.   Swore in an affidavit, "Shortly thereafter, a navy blue BMW driven by Daniel Enrique CANTÚ, pulled up next to the Mercury Grand Marquis. A subject in the Mercury Grand Marquis exited the vehicle and delivered the red and white water cooler to CANTÚ, who was in the navy blue BMW. CANTÚ subsequently placed the water cooler into the passenger compartment of the BMW through the front passenger side door."

   h.   Swore that CANTÚ acted overtly, taking the cooler from RODRIGUEZ's car and placing the cooler into his own car, in furtherance of the DEFENDANTS' agreement to help ensure that CANTÚ would be convicted and to violate CANTÚ's civil rights.

   i.   Swore falsely in her affidavit to corroborate her affidavit with MOODY's affidavit in order to make both affidavits more credible.

j.  Knew that if CANTÚ was convicted, CANTÚ could be sentenced to life in prison.

k.  After she swore in her perjured affidavit, learned that CANTÚ had been incarcerated in the State of Minnesota until Sept. 2010, circa seven months after FBI had initiated its investigation of TMM.

l.  After LABUZ learned that CANTÚ was incarcerated in Minnesota, swore falsely in a new affidavit that FBI had initiated its investigation into TMM in Sept. 2010 instead of Feb. 17, 2010.

56.  Unknown DEFENDANTS

a.  After CANTÚ's arrest, searched his house unlawfully and without a search warrant.

b.  Discovered and seized a handgun in CANTÚ's house.

c.  Charged CANTÚ with two counts of Possession with Intent to Distribute Heroin in violation of 21 USC §§ 846, 841(a)(1), 841(b)(1)(A), 18 USC § 2. Each count carries a maximum sentence of ten-years-to-life and/or a ten million dollar fine. *See* U.S. District Court case number 7:11-cr-1380-003.

d.  Cooperated with other federal agencies to keep CANTÚ in custody until trial.

e.  Seized and caused a forfeit of CANTÚ's BMW automobile.

f.  Seized and caused a forfeit of CANTÚ's $1,936.36.

g.  Seized and caused a forfeit of CANTÚ's handgun.

h.  Misinformed the court and media that CANTÚ took the thermos with heroin from RODRIGUEZ.

i.  Misinformed the court and media that CANTÚ put the thermos with heroin in his car.

j.  Informed the court and media that CANTÚ was arrested for trafficking heroin knowing that he was not guilty of trafficking heroin or any other crime.

k.  Misinformed the court of the aforementioned facts intending for the media to report, broadcast, and publish the aforementioned facts.

57.   The media

    a.   Relied on the false information provided to them by DEFENDANTS.

    b.   Broadcasted and published stories and reports that CANTÚ took the thermos with heroin, transported it to his car, and was arrested for trafficking heroin.

    c.   On Aug. 11, 2011, AIM Media reported on its web site *the Valley Star,* "An informant's tip led FBI agents to three suspected Texas Mexican Mafia members who allegedly smuggled more than 3 pounds of heroin Wednesday, authorities said. […] The undercover officer took the men to H-E-B, 901 E. Expressway 83, Alamo, where Cantu arrived in a navy blue BMW, stepped out and took the cooler [with heroin] from the Grand Marquis, the complaint states."

    d.   On Aug. 12, 2011, AIM Media re-reported the same story on its web site *the Monitor.*

    e.   On Aug. 16, 2011, AIM Media reported on its web site *the Monitor,* "Authorities arrested Cantu [and SMUGGLERS] after they transferred the drug-filled cooler from one car to another, court records state."

    f.   On Aug. 17, 2011, Hearst Newspapers and San Antonio Express-News reported on their web site *My San Antonio*, "On Aug. 10, investigators were able to monitor two smugglers as they brought a water cooler containing four bricks of the heroin across the Rio Grande from Reynosa, Mexico, to a ranch, where the smugglers were picked up and brought to the H-E-B parking lot. FBI agents and local police arrested the smuggling suspects […] as well as alleged gang member Daniel Enrique Cantu, 38, after Cantu put the cooler into the BMW he was driving."

    g.   On Aug. 18, 2011, Ninja Cops Superstore reported on its web site, "Then on Aug. 10, investigators were able to monitor two smugglers as they brought a water cooler containing four bricks of the heroin across the Rio Grande from Reynosa, Mexico, to a ranch where the smugglers were picked up and brought to the H-E-B parking lot. FBI

agents and local police were able to arrest Mexican smugglers […] as well as alleged gang member Daniel Enrique Cantu, 38, after Cantu put the cooler into the BMW he was driving."

    h.  Other media broadcasted and published other libelous information given to them by the DEFENDANTS.

### CANTÚ's Incarceration as a Pretrial Detainee

58.    On or about Aug. 10, 2011, ARREST DEFENDANTS transferred custody of CANTÚ to PRISON DEFENDANTS.

59.    CANTÚ was originally held in solitary confinement.

60.    Approximately three months later, CANTÚ was transferred to general population.

61.    While in general population, CANTÚ was housed with other members of TMM.

62.    One TMM member whom CANTÚ was housed with was BARRIENTES.

63.    Approximately eight months later, CANTÚ was transferred to solitary confinement.

64.    CANTÚ

    a.  Demanded to know the reason why he was transferred to solitary confinement.

    b.  Hand-wrote a letter demanding to be transferred back to general population.

    c.  Delivered the letter to a prison guard.

65.    Deputy Warden Jack Alaniz told CANTÚ that UNKNOWN MARSHALS had confidential reasons to transfer CANTÚ to solitary confinement.

66.    PRISON DEFENDANTS

    a.  Did not explain to CANTÚ why he was transferred to solitary confinement.

    b.  Did not respond to or act on CANTÚ's demands.

    c.  Did not advise CANTÚ on official administrative complaint procedures.

67.    An unknown prison guard told CANTÚ that he was put into solitary confinement to separate CANTÚ from BARRIENTES.

68.     BARRIENTES was not put into solitary confinement, yet his status was equal to CANTÚ as a pretrial detainee who was presumed innocent.

69.     CANTÚ did not exhibit or threaten violence, violate any prison rule, or give any other reason that could justify punishing him with solitary confinement.

70.     While in custody of PRISON DEFENDANTS, CANTÚ

    a.  Vomited blood.

    b.  Had bloody stools.

    c.  Was diagnosed by prison doctors with a bleeding hiatal hernia.

    d.  Was denied any medical care for said maladies.

    e.  Had regular heart burn and constipation.

    f.  Was provided food that aggravated his heart burn and constipation.

    g.  Contracted *tinea pedis* (athlete's foot).

    h.  Was denied medical care for *tinea pedis*.

    i.  For eight months, was kept in solitary confinement twenty-four hours per day.

    j.  For an additional six months, was kept in solitary confinement but allowed to leave his cell for approximately one hour per day.

    k.  While in solitary confinement, was subject to inhumane conditions including but not limited to him suffering from heat exhaustion (CANTÚ's prison cell had a faulty air conditioning unit. When the air conditioner malfunctioned the air in CANTÚ's cell would quickly become hot, humid, oxygen-deficient, and unbearable in the Southern Texas prison location. CANTÚ would bang on his cell door sometimes for hours before a prison guard would open the food port so that CANTÚ could jam his face into the port in order to breathe reasonable air.); limited exercise; limited or absent time outdoors; absent freedom to associate with others; all of which amounted to physical and psychological torture.

l.   Attempted to obtain a civil rights attorney by sending U.S. mail to friends, in order for friends to search for and locate a suitable attorney.

m.   Had his mail intercepted or blocked by PRISON DEFENDANTS.

n.   Was denied the ability to find or communicate with any prospective civil rights attorney to hire them and to receive legal advice or representation.

71.   PRISON DEFENDANTS knowingly and unlawfully interfered with CANTÚ's First Amendment right to seek an attorney through U.S. mail.


**Criminal Trial of CANTÚ**

72.   ARREST DEFENDANTS

a.   Disclosed to CANTÚ's appointed criminal defense attorney fabricated evidence including but not limited to photographs that purportedly depicted the scene of the arrest, the thermos in the trunk of the Mercury Grand Marquis, and RODRIGUEZ at or about the time of the sting operation; and concealed that said evidence was fabricated.

b.   During CANTÚ's criminal trial, presented these fabricated photographs to the jury to attempt to influence the jury, prejudice them against him, and to have him convicted.

73.   ARREST DEFENDANTS failed to disclose

a.   All audio recordings made and used in the FBI investigation.

b.   All photographs made and used in the FBI investigation.

c.   Any video recording made and used in the FBI investigation.

d.   All Brady material, *supra,* in violation of *Brady v. Maryland,* 373 U.S. 83 (1963).

e.   Any physical evidence that would have supported probable cause.

74.   GARZA, MARTINEZ, and RICH, each

a.   Were the photographers of their respective agencies during the sting operation.

b.   Evaded service of summons.

    c. Did not testify at CANTÚ's trial.

75. CANTÚ

    a. Was acquitted on all counts on Oct. 31, 2013.

    b. Was held in custody as a pretrial detainee for eight hundred thirteen (813) days or approximately 2.23 years for crimes that he did not commit.

<b>Ongoing Harassment of CANTÚ</b>

76. CANTÚ, after his release from prison,

    a. Acquired investors who pledged to give him in excess of ten thousand dollars ($10,000) to start and operate a new business.

    b. On or about May 28, 2014, formed Rick's Truck Tire Sales, LLC, and registered it with the Texas Secretary of State.

    c. Thereafter, was informed that he had a warrant for his arrest for felony possession of a handgun relating back to the search of his residence in 2011.

    d. Was informed that the warrant was filed by ARIGULLIN.

    e. On Sept. 10, 2014, turned himself in to the State of Texas.

    f. Was released on bond on the same day.

    g. Was in lawful possession of the handgun pursuant to Texas Penal Code § 46.04.

    h. Lost his investors due to the ongoing campaign by DEFENDANTS to harass and incarcerate CANTÚ, who believed CANTÚ would again be imprisoned and unable to operate his business such as to repay any investment funding.

    i. Has been unable to begin operation of his business without the investment funding.

77. Unknown DEFENDANTS

    a. Knew or should have known that CANTÚ's possession of the handgun was lawful.

    b. Knew that arresting CANTÚ for lawfully possessing a handgun is unlawful,

unconstitutional, and a violation of CANTÚ's civil rights.

c.  Arrested CANTÚ only to abuse, harass, and intimidate him.

### Theft of CANTÚ's Property

78.  On or about Oct. 18, 2011, the BMW automobile's legal owner requested that the seized

BMW be remitted from FBI on the basis that the legal owner did not know of the conduct giving

rise to the forfeiture. FBI denied the request for remission.

79.  On or about March 26, 2014, CANTÚ requested that the BMW automobile be remitted from

FBI on the basis that he was innocent and acquitted by jury.

80.  On or about May 22, 2014, FBI acknowledged receipt of CANTÚ's request for remission

but has not since responded.

81.  BMW was worth circa $11,150 when it was seized by FBI on Aug. 10, 2011.

82.  DEFENDANTS have not returned the $1,936.36 they seized from CANTÚ at his arrest.


VII. CAUSES OF ACTION

**CAUSE 1 — FABRICATION OF EVIDENCE AND/OR MANUFACTURE OF PROBABLE CAUSE IN VIOLATION OF THE FOURTH AND FIFTH AMENDMENTS**
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against FEDERAL DEFENDANTS**

83.  FEDERAL DEFENDANTS

a.  Acted under color of federal law to deprive CANTÚ of his rights to be free from

unreasonable seizures, as guaranteed by the Fourth Amendment of the U.S. Constitution;

and to be free from government behavior that shocks the conscience or is not

fundamentally fair, as guaranteed by the Due Process clause of the Fifth Amendment of

the U.S. Constitution.

b.  Intentionally and deliberately falsified facts, or falsified facts with a reckless disregard

for the truth, in order to fabricate evidence and/or establish probable cause that

objectively did not exist to cause CANTÚ's arrest and imprisonment.

84.    FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

85.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

## CAUSE 2 — UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against FEDERAL DEFENDANTS**

86.    FEDERAL DEFENDANTS

   a.  Acted under color of federal law to deprive CANTÚ of his rights to be free from unreasonable seizures, as guaranteed by the Fourth Amendment of the U.S. Constitution.

   b.  Intentionally and deliberately seized CANTÚ knowing that they did not have probable cause to arrest him, and knowing that he did not commit any crime.

   c.  Seized CANTÚ based on arbitrary and oppressive criteria that any prudent person or law enforcement officer would consider unreasonable.

87.    FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

88.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

## CAUSE 3 — UNREASONABLE SEARCH IN VIOLATION OF THE FOURTH AMENDMENT
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against FEDERAL DEFENDANTS**

89.    FEDERAL DEFENDANTS

   a.  Acted under color of federal law to deprive CANTÚ of his rights to be free from unreasonable searches, as guaranteed by the Fourth Amendment of the U.S. Constitution.

   b.  Intentionally and deliberately searched CANTÚ's residence knowing that they did not have probable cause to arrest him, knowing that he did not commit any crime, and

without CANTÚ's consent.

    c. Searched CANTÚ's residence based on arbitrary and oppressive criteria that any prudent person or law enforcement officer would consider unreasonable.

90. FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

91. CANTÚ suffered emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

**CAUSE 4 — DENIAL OF LIBERTY IN VIOLATION OF
THE FIFTH AMENDMENT**
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against FEDERAL DEFENDANTS**

92. FEDERAL DEFENDANTS

    a. Acted under color of federal law to deny CANTÚ his liberty without due process of law as guaranteed by the Fifth Amendment of the U.S. Constitution.

    b. Intentionally and deliberately seized and imprisoned CANTÚ for 813 days knowing that they did not have probable cause to arrest him, knowing that he did not commit any crime, and therefore knowing that they had no lawful basis to seize and imprison him; actions that are both fundamentally unfair and shock the conscience.

    c. Perjured themselves and conspired or colluded to deprive CANTÚ of his liberty by lodging perjured affidavits, and failing to disclose exculpatory evidence, which they intended and knew would result in CANTÚ being kept in custody without bail.

93. FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

94. CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

**CAUSE 5 — DENIAL OF PROPERTY IN VIOLATION OF
THE FIFTH AMENDMENT**
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against FBI DEFENDANTS**

95. FBI DEFENDANTS

    a.  Acted under color of federal law to deny CANTÚ of his property without due process of law as guaranteed by the Fifth Amendment of the U.S. Constitution.

    b.  Intentionally and deliberately seized and caused a forfeit of CANTÚ's BMW automobile and $1,936.36 cash knowing that they did not have probable cause to arrest him, knowing that he did not commit any crime, and therefore knowing that they had no lawful basis to seize and forfeit his property; actions that are both fundamentally unfair and shock the conscience.

    c.  Perjured themselves and conspired or colluded to deprive CANTÚ of his property by lodging perjured affidavits, and failed to disclosed exculpatory evidence, which they intended and knew would result in CANTÚ's property not being returned.

96.    FBI's DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

97.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FBI DEFENDANTS' actions.

**CAUSE 6 — MALICIOUS PROSECUTION**
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

98.    FEDERAL DEFENDANTS

    a.  Acted under color of federal law to maliciously prosecute CANTÚ.

    b.  Maliciously initiated a criminal case against CANTÚ without probable cause, who was injured therefrom, who was innocent and acquitted. These acts constitute malicious prosecution in the State of Texas.

    c.  Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in furtherance of their employer's business, and to accomplish the objectives for which they were hired.

99.    FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

100.   CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

### CAUSE 7 — FALSE ARREST
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

101.   FEDERAL DEFENDANTS

    a.   Acted under color of federal law to arrest CANTÚ without probable cause and without other lawful authority. These acts constitute false arrest in the State of Texas.

    b.   Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in furtherance of their employer's business, and to accomplish the objectives for which they were hired.

102.   FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

103.   CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

### CAUSE 8 — CONSPIRACY TO VIOLATE CIVIL RIGHTS
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

104.   FEDERAL DEFENDANTS

    a.   Acted under color of law to conspire to violate CANTÚ's civil rights.

    b.   Agreed to fabricate evidence or manufacture probable cause against CANTÚ and cause criminal charges to be filed against him; and agreed to continue to violate CANTÚ's civil rights through perjury, failing to disclose exculpatory evidence, and through other means; and in fact committed these acts. These acts constitute civil conspiracy in the State of Texas.

    c.   Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in

furtherance of their employer's business, and to accomplish the objectives for which they were hired.

105.    FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

106.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

### CAUSE 9 — CONVERSION
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

107.    FEDERAL DEFENDANTS

    a.    Acted under color of federal law to convert CANTÚ's property unlawfully.

    b.    Seized and permanently deprived CANTÚ of his 2003 BMW 325i automobile and his $1,936.36 cash; had no lawful right and did not have CANTÚ's permission to seize them; and did not return them promptly upon CANTÚ's release from custody or upon his demand. These acts constitute conversion in the State of Texas.

    c.    Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in furtherance of their employer's business, and to accomplish the objectives for which they were hired.

108.    FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

109.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

### CAUSE 10 — DEFAMATION PER SE
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

110.    FEDERAL DEFENDANTS

    a.    Acted under color of law to defame and libel CANTÚ.

    b.    Intentionally communicated to several media outlets that CANTÚ was arrested for

trafficking heroin and stated that CANTÚ trafficked heroin, knowing that CANTÚ did not commit any crime, intending and knowing that the media outlets would broadcast and publish said defamation in oral and/or written form, knowing that being accused of trafficking illegal drugs injure CANTÚ's reputation in his community, and therefore expose CANTÚ to public hatred, contempt, ridicule, and financial injury. These acts constitute defamation per se in the State of Texas.

c. Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in furtherance of their employer's business, and to accomplish the objectives for which they were hired.

111.   FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

112.   CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions, including but not limited to the failure of his new business venture.

### CAUSE 11 — NEGLIGENCE
*28 U.S.C. § 1346, 2671 et seq.*
**Asserted against USA**

113.   FEDERAL DEFENDANTS

a. Breached the duty imposed on them to protect CANTÚ from civil rights violations caused by other law enforcement officers that they could have prevented or stopped.

b. Had a duty to protect the civil rights of CANTÚ, and breached their duty by allowing other law enforcement officers to falsely arrest CANTÚ, fabricate evidence and/or manufacture probable cause against CANTÚ, and allow CANTÚ to remain in custody while knowing that CANTÚ did not commit any crime. These acts constitute negligence in the State of Texas.

c. Had a reasonable opportunity to prevent or stop said violations.

    d.   Committed these acts as employees of the United States while acting in the scope of their employment, acted within the scope of the general authority granted to them in furtherance of their employer's business, and to accomplish the objectives for which they were hired.

114.   LEE, HUSAK, and Unknown supervisors participated in these civil rights violations, and knew that their subordinates participated in these civil rights violations but failed to prevent or stop the violations.

115.   FEDERAL DEFENDANTS who were bystanders failed to prevent or stop these civil rights violations.

116.   FEDERAL DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

117.   CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the FEDERAL DEFENDANTS' actions.

**CAUSE 12 — FABRICATION OF EVIDENCE AND/OR
MANUFACTURE OF PROBABLE CAUSE IN VIOLATION OF
THE FOURTH AND FOURTEENTH AMENDMENTS**
*42 USC § 1983*
**Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS**

118.   DPS DEFENDANTS and DEPUTY DEFENDANTS

    a.   Acted under color of state law to deprive CANTÚ of his rights to be free from unreasonable seizures, as guaranteed by the Fourth Amendment of the U.S. Constitution; and to be free from government behavior that shocks the conscience or is not fundamentally fair, as guaranteed by the Due Process clause of the Fourteenth Amendment of the U.S. Constitution.

    b.   Intentionally and deliberately falsified facts, or falsified facts with a reckless disregard for the truth, in order to fabricate evidence and/or establish probable cause that objectively did not exist in order to justify and cause CANTÚ's arrest and imprisonment.

119.   DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and

proximate cause of CANTÚ's injuries.

120.     CANTÚ suffered physical, emotional, and economic injuries and continues to suffer

emotional and economic injuries because of the DPS DEFENDANTS' and DEPUTY

DEFENDANTS' actions.

### CAUSE 13 — FALSE ARREST IN VIOLATION OF
### THE FOURTH AMENDMENT
*42 USC § 1983*
**Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS**

121.     DPS DEFENDANTS and DEPUTY DEFENDANTS

    a.  Acted under color of state law to arrest CANTÚ without probable cause and without

        other lawful authority.

122.     DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and proximate

cause of CANTÚ's injuries.

123.     CANTÚ suffered physical, emotional, and economic injuries and continues to suffer

emotional and economic injuries because of the DPS DEFENDANTS' and DEPUTY

DEFENDANTS' actions.

### CAUSE 14 — MALICIOUS PROSECUTION IN VIOLATION OF
### THE FOURTH AMENDMENT
*42 USC § 1983*
**Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS**

124.     DPS DEFENDANTS and DEPUTY DEFENDANTS

    a.  Acted under color of state law to maliciously prosecute CANTÚ.

    b.  Maliciously initiated a criminal case against CANTÚ, who was innocent, who was

        injured therefrom, without probable cause that resulted in his acquittal. These acts

        constitute malicious prosecution in the State of Texas.

125.     DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and

proximate cause of CANTÚ's injuries.

126.     CANTÚ suffered physical, emotional, and economic injuries and continues to suffer

emotional and economic injuries because of the DPS DEFENDANTS' and DEPUTY

DEFENDANTS' actions.

### CAUSE 15 — DEFAMATION PER SE IN VIOLATION OF
### THE FIFTH AND FOURTEENTH AMENDMENTS
*42 USC § 1983*
**Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS**

127.    DPS DEFENDANTS and DEPUTY DEFENDANTS

   a.   Acted under color of state law to defame and libel CANTÚ.

   b.   Intentionally communicated to several media outlets that CANTÚ was arrested for

        trafficking heroin and stated that CANTÚ trafficked heroin, knowing that CANTÚ did

        not commit any crime, intending and knowing that the media outlets would broadcast

        and publish said defamation in oral and/or written form, knowing that being accused of

        trafficking illegal drugs would injure CANTÚ's reputation in his community, and

        therefore expose CANTÚ to public hatred, contempt, ridicule, and financial injury.

   c.   Violated CANTÚ's rights to liberty and privacy under the Fifth Amendment as applied

        to the states through the Fourteenth Amendment, and Due Process Clause under the

        Fourteenth Amendment.

128.    DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and

proximate cause of CANTÚ's injuries.

129.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer

emotional and economic injuries because of DPS DEFENDANTS' and DEPUTY DEFENDANTS'

actions, including but not limited to the failure of his new business venture.

### CAUSE 16 — FAILURE TO PREVENT CIVIL RIGHTS VIOLATIONS
### IN VIOLATION OF THE FOURTEENTH AMENDMENT
*42 USC § 1983*
**Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS**

130.    DPS DEFENDANTS and DEPUTY DEFENDANTS

   a.   Breached duties imposed on them under state law to protect CANTÚ from civil rights

violations caused by other officers that they could have prevented or stopped.

b.  Had a duty to protect the civil rights of CANTÚ, and breached their duty by allowing other law enforcement officers to falsely arrest CANTÚ, fabricate evidence and/or manufacture probable cause against CANTÚ, and allow CANTÚ to remain in custody while knowing that CANTÚ did not commit any crime.

c.  Had a reasonable opportunity to prevent or stop said violations.

131.  BARRERA and Unknown supervisors directly participated in these civil rights violations, knew that their subordinates participated in these violations, but failed to prevent or stop the violations.

132.  DPS DEFENDANTS and DEPUTY DEFENDANTS who were bystanders and witnessed the civil rights violations failed to prevent or stop these violations.

133.  DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and proximate cause of CANTÚ's injuries.

134.  CANTÚ suffered physical, emotional, and economic injuries and continues to suffer emotional and economic injuries because of the DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions.

## CAUSE 17 — CIVIL CONSPIRACY
### *42 USC § 1983*
### Asserted against DPS DEFENDANTS and DEPUTY DEFENDANTS

135.  DPS DEFENDANTS and DEPUTY DEFENDANTS

a.  Acted under color of state law to conspire to violate CANTÚ's civil rights.

b.  Agreed to fabricate evidence or manufacture probable cause against CANTÚ and cause criminal charges to be filed against CANTÚ; and agreed to continue to violate CANTÚ's civil rights through perjury, failure to disclose exculpatory evidence, and through other means; and in fact committed these acts.

136.  DPS DEFENDANTS' and DEPUTY DEFENDANTS' actions were the direct and

proximate cause of CANTÚ's injuries.

137.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer
emotional and economic injuries because of the DPS DEFENDANTS' and DEPUTY
DEFENDANTS' actions.

### CAUSE 18 — CONSPIRACY TO VIOLATE CIVIL RIGHTS
*42 USC § 1985(3)*
**Asserted against ARREST DEFENDANTS**

138.    ARREST DEFENDANTS

    a.  Acted under color of law to conspire to violate CANTÚ's civil rights.

    b.  Agreed to fabricate evidence and/or manufacture probable cause against CANTÚ and
cause criminal charges to be filed against him; and agreed to continue to violate
CANTÚ's civil rights through perjury, failure to disclose exculpatory evidence, and
through other means; and in fact committed these acts.

    c.  Denied CANTÚ the equal protection and immunities of the law.

    d.  Targeted CANTÚ because he belongs to a class of individuals who have felony
convictions or were previously incarcerated.

    e.  Invidiously discriminated against CANTÚ because of his class membership in violation
of public policy not to persecute civilians after their criminal sentence has been served
and debt to society paid.

139.    ARREST DEFENDANTS' actions were the direct and proximate cause of CANTÚ's
injuries.

140.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer
emotional and economic injuries because of the ARREST DEFENDANTS' actions.

### CAUSE 19 — NEGLIGENT TRAINING AND SUPERVISION
*42 USC § 1983*
**Asserted against GUERRA and COUNTY**

141.    GUERRA and COUNTY have a plainly inadequate policy, procedure, custom, practice, or

protocol for training and/or supervising their law enforcement officers.

142.    Specifically, GUERRA and COUNTY through their Sheriff's Department's supervisors created, implemented, continued, or ratified GUERRA's or COUNTY's policy, procedure, custom, practice, or protocol to permit their law enforcement officers to allow, acquiesce, ratify, or endorse other law enforcement officers' violating a civilian's civil rights without (1) preventing the violations before they took place if said officers had a reasonable opportunity to do so, (2) stopping the violations from taking place if said officers had a reasonable opportunity to do so, and (3) reporting the violations such as to mitigate any injuries caused to the civilian.

143.    GUERRA and COUNTY failed to train their law enforcement officers, including those DEPUTY DEFENDANTS named herein, in how to prevent, stop, and report civil rights violations at the time they took place and any time thereafter.

144.    GUERRA and COUNTY failed to supervise their law enforcement officers, including those DEPUTY DEFENDANTS named herein, to ensure and guard against any of their employees' failures to prevent, stop, or report civil rights violations at the time they took place and any time thereafter.

145.    GUERRA's and COUNTY's failure to train and supervise is itself an implicit policy, procedure, custom, practice, or protocol.

146.    GUERRA and COUNTY participated in or supervised the civil rights violations suffered by CANTÚ.

147.    DEPUTY DEFENDANTS named herein had the duty to prevent, stop, and report said civil rights violations caused by other law enforcement officers.

148.    Due to their lack of training and supervision, DEPUTY DEFENDANTS named herein failed to prevent, stop, or report said civil rights violations caused by other officers.

149.    Without an adequate policy, procedure, custom, practice, or protocol on preventing, stopping, and reporting civil rights violations caused to civilians, and training therefrom, it is highly

predictable that DEPUTY DEFENDANTS would follow standards inconsistent with the United States and Texas Constitutions.

150.    It is further highly predictable that constitutional violations would occur from GUERRA's and COUNTY's failure to create, implement, adapt, or maintain constitutional standards for preventing, stopping, and reporting civil rights violations.

151.    Under these circumstances, GUERRA's and COUNTY's policy, procedure, custom, practice, or protocol of failing to train and supervise their law enforcement officers on constitutional standards for preventing, stopping, and reporting civil rights violations was consciously and deliberately indifferent, created unmistakable municipal culpability, and was a directly related moving force behind the deprivation of CANTÚ's constitutional rights under color of law.

152.    Further, GUERRA and COUNTY know that law enforcement officers occasionally violate the civil rights of people they are charged to serve and protect. GUERRA's predecessor, Hidalgo County Sheriff Lupe Treviño, resigned and pled guilty to crimes involving the Sheriff's Panama Unit scandal that involved his deputies who conspired with drug traffickers. The allegations of corruption against Treviño and the Panama Unit took place during the same time period as DEFENDANTS' injuries against CANTÚ. FBI Special Investigator Rock Stone and his public corruption task force are presently investigating law enforcement officers in GUERRA's and COUNTY's jurisdiction. Therefore, GUERRA's and COUNTY's policy, procedure, custom, practice, or protocol for training and/or supervising their law enforcement officers is plainly inadequate and was implemented knowingly with deliberate indifference to the constitutional rights of CANTÚ and the public.

153.    These actions and omissions of GUERRA and COUNTY constitute supervisory encouragement or acquiescence in the deprivations of CANTÚ's civil rights under color of law.

//

//

## CAUSE 20 — INHUMANE TREATMENT IN VIOLATION OF THE FOURTEENTH AMENDMENT

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)*
**Asserted against UNKNOWN MARSHALS**

154.    UNKNOWN MARSHALS

   a.   Acted under color of federal law to deprive CANTÚ of his rights to be free from government behavior that shocks the conscience or is not fundamentally fair, as guaranteed by the Due Process clause of the Fourteenth Amendment of the U.S. Constitution.

   b.   Intentionally and deliberately punished CANTÚ by keeping him locked in solitary confinement for fourteen months for no lawful reason while CANTÚ suffered physical and psychological torture.

   c.   Failed to ensure CANTÚ was appropriately cared for such as for him to have a working air conditioning unit, suitable medical care, and access to U.S. mail.

155.    UNKNOWN MARSHALS's actions were the direct and proximate cause of CANTÚ's injuries.

156.    CANTÚ suffered physical, emotional, and economic injuries and continues to suffer physical, emotional, and economic injuries because of UNKNOWN MARSHALS's actions.

## CAUSE 21 — NEGLIGENCE

*Texas Common Law*
**Asserted against LCS**

157.    LCS, through its officials and employees

   a.   Provided food that it knew or should have known would aggravate CANTÚ's heart burn and constipation. Failed to treat CANTÚ's medical maladies that it diagnosed while CANTÚ was in its custody and unable to seek other medical care. Allowed CANTÚ to languish and suffer in his prison cell with inadequate ventilation, even after it knew that CANTÚ's air conditioning unit regularly malfunctioned. These acts constitute negligence in the State of Texas.

    b.   Breached its duty to prevent said injuries.

    c.   Had a reasonable opportunity to treat, prevent, or otherwise abate said injuries.

158.   LCS's actions were the direct and proximate cause of CANTÚ's injuries.

159.   CANTÚ suffered physical, emotional, and economic injuries and continues to suffer physical, emotional, and economic injuries because of LCS's actions.

## VIII. QUALIFIED IMMUNITY

160.   Qualified immunity shields a law enforcement officer from liability for violating a person's rights but who is nonetheless engaged in objectively good faith conduct. The wrongful investigation, prosecution, conviction, incarceration of a plaintiff, or the fabrication of evidence, or manufactured probable cause denies a law enforcement officer qualified immunity. *Spurlock v. Satterfield,* 167 F.3d 995 (6th Cir. 1999).

161.   "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald,* 457 US 800, 818-19 (1982).

162.   DEFENDANTS are not entitled to qualified immunity because they knowingly conspired, fabricated evidence and/or manufactured probable cause against CANTÚ that resulted in his wrongful arrest, incarceration, prosecution, and other damages.

163.   No reasonable officer would ever believe that this conduct was justifiable under the U.S. Constitution. Instead, all reasonable officers would know that such conduct was plainly incompetent or a knowing violation of the law.

//

//

## IX. DAMAGES

164.    CANTÚ suffered loss of liberty, mental anguish, post-traumatic stress disorder, physical and emotional injuries, pain and suffering, embarrassment, humiliation, shame, indignity, invasion of his home, loss of property, and special damages that he incurred or will incur, including but not limited to past, present, and future lost wages; legal fees and legal expenses.

165.    CANTÚ was wrongfully incarcerated for eight hundred thirteen days, time that he will never get back to enjoy his life, companionship of friends and family, and experience the wonderment of the world. DEFENDANTS' conduct described in this Complaint is the direct and proximate cause of all of these injuries.

166.    DEFENDANTS acted with malicious, intentional, reckless, or callous indifference to CANTÚ's constitutional rights during the events at issue in this case, to wit fabricating evidence or manufacturing probable cause, perjuring affidavits, and continuing their conspiracy to frame and imprison CANTÚ for crimes that he clearly did not commit.

167.    The conduct of ARREST DEFENDANTS and UNKNOWN MARSHALS justifies an award of punitive and exemplary damages against each of these DEFENDANTS individually, and CANTÚ seeks an award of punitive and exemplary damages against each of these DEFENDANTS individually in an amount to be determined by the jury in this case.

## X. RELIEF SOUGHT

168.    In light of the foregoing, the Plaintiff asks for Judgment as follows:

    a.    Actual and compensatory damages against all Defendants;

    b.    Punitive damages against natural person Defendants who are sued in their individual capacity;

    c.    Pre-judgment and post-judgment interest;

    d.    Statutory and reasonable attorney's fees;

e.   All costs expended to bring suit; and

f.   All such other relief at law or in equity to which Plaintiff is entitled.

Respectfully submitted,

*/s/ Jerold D. Friedman*
Jerold D. Friedman
*Attorney for Plaintiff*
Cal. SBN 290434
Fed. ID 2117436
*jerry@activistlaw.com*
17515 Spring-Cypress Rd., Suite C-360
Cypress, TX 77429
(281) 810-8812, fax (281) 667-3506